UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Sagax Development Corp., | : |
| Plaintiff, | : CIV. A. NO. |
| - against - | : **COMPLAINT** |
| ITrust S.A., | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Sagax Development Corp. ("Sagax"), through its undersigned counsel, hereby brings this action against ITrust S.A. ("ITrust") and state as follows:

## NATURE OF THE ACTION

1. This action arises out of ITrust's breach of its agreement with Sagax dated October 9, 2015 (the "Agreement"), to grant Sagax a 2.5% equity interest in ITrust in exchange for over a year of Sagax's hard work serving as an advisor to ITrust and its' efforts to secure investors and investments in ITrust's growing business.

2. Per the Agreement, Sagax, through the efforts of its President, Luc Hardy, found and solicited investors to invest in ITrust's business. As a result of Mr. Hardy's performance, ITrust received approximately €1,716,000 in investments (approximately $2,000,000), an amount larger than even called for under the Agreement.

3. Despite Sagax's full performance, ITrust refuses to grant Sagax the 2.5% equity interest in ITrust's business as agreed, or for that matter, grant or pay Sagax any compensation whatsoever. ITrust has instead accepted and utilized Sagax's advice and the investments procured by Sagax, without compensating Sagax for its performance in any way. Sagax is owed a 2.5% equity interest in ITrust's business as promised by ITrust.

## PARTIES

4. Plaintiff Sagax is a Connecticut corporation with its principal place of business in Cos Cob, Connecticut. Sagax is an advisory company that consults with and advises startup companies and emerging growth entrepreneurs, principally in the technology industry.

5. Upon information and belief, Defendant ITrust is a French technology company with its principal place of business in Toulouse, France.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Sagax seeks equity interest in ITrust, the value of which exceeds $75,000, and complete diversity exists between Sagax and ITrust.

7. This Court has personal jurisdiction over ITrust because ITrust transacted business in New York and a substantial part of the events giving rise to Sagax's claims occurred in New York.

8. Pursuant to the Agreement, Sagax and ITrust negotiated, met, and worked with many New York investors for the purpose of securing investments for ITrust. ITrust spent a substantial amount of time in New York, New York, meeting with Sagax President, Mr. Hardy, and potential investors. Upon information and belief, ITrust communicated with potential investors in New York via email and phone. Upon information and belief, to facilitate its work in the U.S., ITrust secured office space for at least a two-month period in 2016 in New York, New York.

9. After approximately seven to eight months of efforts to partner with investors, that largely took place in Manhattan, ITrust ultimately entered into agreements with three (3) New York investors. Upon information and belief, these New York investors all entered into

agreements with Defendant to invest capital in ITrust in exchange for a percentage of equity in ITrust.  Thus, Defendant's business relationships with these three (3) New York investors remain ongoing, as they remain investors and equity holders in ITrust.  Upon information and belief, one of these New York investors more recently reinvested in ITrust in an additional round of funding.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Sagax's claims occurred in this District and because Defendant is subject to personal jurisdiction here.

## STATEMENT OF FACTS

11. On August 24, 2015, Luc Hardy, President of Plaintiff Sagax, was contacted by David Ofer, Vice President and Board Member of ITrust.  Mr. Ofer explained to Mr. Hardy that he was joining a French startup company, ITrust, which wanted to "flip" its business (*i.e.* flip all of the company's assets and entire business) into a U.S. company, and raise a financing round from U.S. private investors and/or venture capital firms to grow the business in the U.S.

12. Mr. Hardy is an experienced investor and entrepreneur, with experience working with French businesses that are interested in "flipping" their business into a U.S. based-company.  Mr. Hardy's work focuses on advising French technology startup companies on how to efficiently access the U.S. market, especially via re-domiciliation in the U.S.

13. Mr. Ofer explained to Mr. Hardy that ITrust had been studying the U.S. market and developing its business plan to enter the U.S.  Mr. Ofer explained that ITrust executives were eager to flip their business into a U.S. corporation and raise funds from U.S. investors to make the business successful in the U.S.

14. At the time, ITrust was (and still is) owned by father and son founders, Henri Piotrowski and his son, Jean-Nicolas Piotrowski ("Mr. Piotrowski"), among other investors.

15. Mr. Hardy met with Mr. Ofer and Mr. Piotrowski in Paris, France on September 29, 2015, to discuss ITrust's business and growth plan and how Sagax and Mr. Hardy could assist with ITrust's growth in the U.S. by helping to identify potential investors.

16. Following the September 29, 2015, meeting, Mr. Hardy continued to communicate and negotiate with Mr. Ofer and Mr. Piotrowski via email and phone calls.

17. On October 9, 2015, Mr. Hardy met with Mr. Ofer in Paris, France and entered into the Agreement on behalf of Sagax. Mr. Piotrowski entered into the Agreement on behalf of ITrust later that same day. Pursuant to the Agreement, Sagax would serve as an advisor to and assist in raising funds for ITrust, and in exchange, Sagax would become an equity holder and was granted the right to invest in the newly "flipped" ITrust, now a U.S. company.

18. Specifically, the Agreement stated that ITrust would form "NewCo," a U.S. subsidiary of ITrust, to grow ITrust's business in the U.S. The Agreement explained that "ITrust seeks to develop its activities internationally and more particularly to establish itself in the U.S.A." A certified translation of the Agreement is attached hereto as **Exhibit A**. Under the Agreement, Sagax was required to "accompany ITrust's project by linking it with American investment funds that will be able to make the investments necessary for the successful completion of the Company's project." *See* **Exhibit A**.

19. Under the Agreement, NewCo would be formed to be the recipient of all operations and assets of ITrust, with Sagax to own 2.5% of the equity interest. *See* **Exhibit A**. Sagax was to invest $50,000 and help secure funding of $450,000, for a total of $500,000 invested in NewCo by December 31, 2015. *See* **Exhibit A**.

20. Mr. Hardy, on behalf of Sagax, immediately began working under the Agreement. Mr. Hardy brainstormed potential partnerships and pitched potential investors the opportunity to invest in ITrust.[1] Mr. Hardy introduced ITrust, through Mr. Ofer and Mr. Piotrowski, to high-level potential investors. Mr. Hardy negotiated with and persuaded potential investors to consider investing in ITrust at the valuation sought by ITrust. Mr. Hardy also advised ITrust generally regarding entry in the U.S. market.

21. Mr. Hardy dedicated a great deal of time seeking investors for ITrust. From approximately October 2015 when the Agreement was entered into, to the summer of 2016, Mr. Hardy participated in over one hundred (100) telephone calls and Skype calls with Mr. Ofer and Mr. Piotrowski, and potential investors, partners, service providers, and attorneys, all related to his work as an advisor to ITrust. In that time, Mr. Hardy also sent and received hundreds of emails related to this work.

22. As a result of Mr. Hardy's efforts, Mr. Hardy, Mr. Ofer, and Mr. Piotrowski attended, together or separately, numerous business meetings with potential investors. Approximately ten (10) such meetings took place in New York City, New York, from October 2015 to June 2016. The purpose of each of these meetings was to secure capital funding for ITrust from outside investors. Upon information and belief, ITrust obtained office space in New York City from approximately May 2016 to June 2016 in part to facilitate these meetings and its efforts to obtain funding from investors, as arranged by Mr. Hardy.

---

[1] In fact, Mr. Ofer drafted an email for Mr. Hardy to use as his opening email to potential investors, pitching ITrust as an exciting investment opportunity. *See* Mr. Ofer's October 12, 2015 email to Mr. Hardy and Mr. Piotrowski attached hereto as **Exhibit B**. Mr. Ofer's draft email to investors stated: "Itrust is now French-based but will be moving to the United States around year end. I wanted you to have an early look at this potential exciting transaction. I am a shareholder and helping in the US process." *Id*. As demonstrated by Mr. Ofer's email, it was understood by ITrust and Sagax from the beginning that Sagax was to be a shareholder in ITrust.

23. Although Sagax and Mr. Hardy began performing under the Agreement immediately after signing, ITrust departed from the terms of Agreement shortly after entering into it.

24. Under the Agreement, ITrust was to form the U.S. corporation subsidiary, NewCo, and to transfer ITrust's assets into this U.S. subsidiary, prior to December 31, 2015. In fact, after entering into the Agreement in October 9, 2015, ITrust decided not to "flip" or transfer its assets into a U.S. subsidiary.

25. Instead, ITrust began exploring various other options to keep its business in Europe. In a November 13, 2015 email from Mr. Piotrowski to Mr. Hardy, Mr. Piotrowski explained that "[t]he fundamental problem [with flipping ITrust to a U.S. subsidiary] is the issue with French EXIT tax." A certified translation of Mr. Piotrowski's November 13, 2015 email to Mr. Hardy is attached hereto as **Exhibit C**. (See also a certified translation of a November 21, 2015 email from Mr. Piotrowski to Mr. Hardy and Mr. Ofer explaining that after speaking with a "FR tax expert" he is reconsidering the "very significant" impacts of flipping ITrust to a U.S. company, attached hereto as **Exhibit D**.) Mr. Piotrowski was especially concerned with the large tax implication that the flip would have on him personally, as a large shareholder of ITrust. In his November 21, 2015 email, Mr. Piotrowski explained to Mr. Hardy that he recently learned that as the only shareholder with over 33% equity, the flip would cost Mr. Piotrowski over $1 million. *See* **Exhibit D**. ITrust considered multiple scenarios of developing its business, including creating a U.S. subsidiary that was only "an operational software subsidiary" and not a "flip" of ITrust's assets into an American company, transferring the business to a Luxembourg structure, and keeping the business in France, which it ultimately did. *See, e.g.*, **Exhibit C**. Mr.

Piotrowski assured Mr. Hardy that Sagax would receive shares in the company that held ITrust's assets, whether it be a subsidiary (in the U.S. or elsewhere) or in ITrust.

26. ITrust did not form a U.S. subsidiary until June 2016, and when it formed Reveelium Inc., a U.S. subsidiary of ITrust, ITrust did not "flip" all of its assets into the U.S. subsidiary as contemplated by the parties under the Agreement. ITrust's operations and assets remained with ITrust, and upon information and belief, the U.S. subsidiary, Reveelium, is a dormant corporation. As a result, since the U.S. subsidiary did not exist on or prior to December 31, 2015, Sagax and Mr. Hardy could not invest in it or seek investors to invest in it at that time.

27. Despite this, Sagax and Mr. Hardy continued their efforts to find investors for ITrust. Since ITrust's operations and assets remained in ITrust, and were not "flipped" into a U.S. subsidiary, Sagax and Mr. Hardy sought investors to invest funds directly into ITrust itself.

28. Ultimately, Sagax and Mr. Hardy identified, solicited, negotiated with and secured five (5) investors to invest in ITrust. Mr. Hardy was responsible for introducing all five investors to ITrust and facilitating the investments.

29. Four (4) of these investors are "business angels" who collectively invested approximately €216,000 in ITrust. Upon information and belief, three (3) of these investors are New York residents, and one (1) is a resident of Paris, France. These investments were made and this "round" of funding was completed by April, 2016.

30. The fifth investor identified by Sagax was a Paris-based French venture capital fund, New Alpha, which invested approximately €1,500,000 in ITrust. This investment was finalized in May, 2016.

31. Upon information and belief, ITrust entered into agreements with each of these five (5) investors granting them a percentage of equity in ITrust, in exchange for their investment. Upon information and belief, each remains an equity holder in ITrust today.

32. Thus, although ITrust did not form a U.S. subsidiary to attract U.S. investors, Sagax and Mr. Hardy still performed under the Agreement and found investors to invest in ITrust in the amount of almost $2,000,000. This amount is far more than Sagax was obligated to assist ITrust in raising under the Agreement.

33. Unfortunately, despite the tireless work and advice Sagax and Mr. Hardy undertook for many months from the fall of 2015 through the winter of 2017, and the undeniable success of these efforts – raising approximately €1,716,000 in investments for ITrust – ITrust has refused to grant Sagax the 2.5% equity interest in ITrust that it is owed under the Agreement. In fact, Defendant refuses to compensate Sagax or Mr. Hardy at all.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Contract)

34. Sagax repeats and realleges each and every allegation contained in paragraphs 1 through 33 as if they were fully set forth herein.

35. On October 9, 2015, the Agreement was executed and signed by Mr. Hardy on behalf of Sagax and Mr. Piotrowski on behalf of ITrust.

36. The Agreement was a valid and enforceable contract by and between Sagax and ITrust.

37. Sagax fully performed under the Agreement. From October 9, 2015 through May 2016 Mr. Hardy solicited potential investors to invest in ITrust; introduced ITrust to potential investors; and advised negotiations between ITrust and investors. As a direct result of Mr.

Hardy's substantial efforts, ITrust received investments totaling approximately €1,716,000 from investors that were solicited by and introduced by Mr. Hardy. Mr. Hardy continued to serve as an advisor and consultant to ITrust through the first quarter of 2017. Pursuant to the Agreement, Sagax is entitled to 2.5% equity interest in ITrust. The Agreement also granted Sagax the right to invest $50,000 (at a discount) in ITrust's U.S. subsidiary once the company was "flipped" into the U.S. subsidiary.

38. ITrust failed to compensate Sagax with 2.5% of equity interest in ITrust or compensate Sagax at all for its performance under the Agreements. Further, since ITrust did not flip its business into a U.S. company, Sagax could not invest $50,000 in the U.S. company.

39. ITrust's failure to compensate Sagax for its performance under the Agreement amounts to a material breach of the Agreement.

40. As a result, Sagax has and will continue to sustain damages.

## COUNT TWO
## (Unjust Enrichment)

41. Sagax repeats and realleges each and every allegation contained in paragraphs 1 through 40 as if they were fully set forth herein.

42. If for any reason the Court decides that no valid contract existed between the parties covering the circumstances discussed above, then, in the alternative, Sagax seeks relief under this count, for unjust enrichment.

43. Sagax conferred benefits on ITrust as a result of Mr. Hardy's solicitation of potential investors to invest in ITrust; introductions of ITrust to potential investors; advising of negotiations between ITrust and investors; and general consulting for ITrust, especially regarding the U.S. market. As a direct result of Mr. Hardy's substantial efforts, ITrust received

investments totaling approximately €1,716,000 from investors who were solicited by and introduced by Mr. Hardy.

44. ITrust accepted and utilized Sagax's services from October 9, 2015 through the first quarter of 2017, and has been unjustly enriched as a direct and proximate result of the work and efforts performed for ITrust by Sagax.

45. It would be inequitable for ITrust to retain the benefit of Sagax's services without payment for them, and Sagax should be compensated for the services it provided to ITrust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a. Judgment awarding Sagax 2.5% equity interest in ITrust as owed to Sagax under the Agreement, accounting for any and all tax implications that will affect the value of Sagax's ownership as a result of ITrust's delay in issuing the 2.5% equity;

b. Judgment awarding Sagax damages for unjust enrichment;

c. Award of compensatory and punitive damages in an amount to be determined at trial as well as pre- and post-judgment interest; and

d. Award of costs and expenses, including attorneys' fees and expenses, and such other amounts as the Court deems just and proper.

Dated:  New York, New York.
        April 16, 2019

Respectfully Submitted,

McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
+1 212 547 5400

By:  /s/ Lillian A. Horan
     John J. Calandra
     Michael R. Huttenlocher

                                                                 Lillian A. Horan
                                                                 *Attorneys for Plaintiff*
                                                                 *Sagax Development Corp.*

DM_US 159130698-2.107734.0011